IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Criminal Case No.  06-cr-00373-WYD-1

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  SAMMY EDWARD FRENCH,

      Defendant.

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

I.      <u>INTRODUCTION</u>

      THIS MATTER was before the Court in connection with a hearing on

Defendant's Motion to Suppress Identification (filed October 23, 2006).  The parties

briefed the issue presented in the motion and submitted supplemental briefs as well.

Evidence was presented on May 10, 2007, May 16, 2007, May 23, 2007, and May 30,

2007, and the parties' exhibits were received into evidence.

      For the reasons stated in this Order and on the record and after consideration of

the testimony at the hearing and the argument of the parties, Defendant's Motion to

Suppress Identification is DENIED.

II.      <u>BACKGROUND</u>

      Various banks in Colorado, in both the Colorado Springs area and the Denver

Metro area, were robbed between January 9, 2006 and July 3, 2006.  *Mot. to Suppress*

*Identification, at 1.*  After receiving a tip that Defendant was involved, Colorado Springs

Police Department ("CSPD") Detective Clifford Gregory put together a six picture

photographic lineup containing a picture of Defendant. *Id.* Detectives from the CSPD

and the Rocky Mountain Safe Streets Task Force ("RMSSTF") presented copies of this

lineup to the various teller victims and other witnesses who were in the banks when

they were robbed. Defendant has challenged the legality of the identifications made by

the witnesses.

III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

In deciding Defendant's motion to suppress, I follow the two-step test articulated

in *United States v. Sanchez,* 24 F.3d 1259, 1261 (10th Cir. 1994). First, I must decide

whether the photo array was unnecessarily suggestive. *Id.* at 1261-1262. If I

determine that the procedure was unnecessarily suggestive, I then must decide

whether the identification was reliable under the totality of circumstances. *Id.*; *see also*

*Neil v. Biggers*, 409 U.S. 188, 199 (1972). "These two prongs must be analyzed

separately, and it is only necessary to reach the second prong if the court first

determines that the array was impermissibly suggestive." *Sanchez*, 24 F.3d at 1262.

A.   The First Step - Was the Lineup Unnecessarily Suggestive?

Detective Gregory was responsible for putting together the photo lineup and

selecting the photographs. *Hearing Transcript ("Tr.") at 8:7-12, 40:7-12, 41:7-8.*

Detective Gregory chose three of the photographs from the Police Department's digital

photo system - photos in positions 1, 5, and 6. *Id. at 41:9-21*; *Ex. 1A.* The remaining

three photographs - positions 2, 3, and 4 - were drawn from the Colorado Department

of Revenue's drivers license photographs. *Tr. at 41:22-42:20; Ex. 1A.* Detective

Gregory testified that he was concerned with not making the lineup unduly suggestive. *Tr. at 7:11-15.* He also testified that he selected individuals to put into the lineup who were of similar but not identical appearance. *Id. at 8:3-11:13; Exs. 1A, 1.*

Three of the photographs had different colored backgrounds than the other three. *Tr. at 44:14-19; Ex. 1A.* The photographs in positions 2, 3 and 4 have blue backgrounds whereas the photographs in positions 1, 5 and 6 had a white or a lighter background. *Exs. 1A, 3.* The photographs were randomly placed in positions on the lineup card, and the size of the lineup card is a standard size document used by the CSPD. The photos are color photos. *Tr. at 46:12-47:16; Ex. 1A.* Detective Gregory testified that it is CSPD policy to use six photographs in a photographic lineup. *Tr. at 47:17-48:6.*

Detective Gregory also testified that he learned that the photograph of the defendant that was used in the photographic lineup was released to the public and used in a newspaper article before the lineup was shown to some of the witnesses. *Def.'s Ex. A.* The newspaper article was published after an arrest warrant was issued for Defendant's arrest. *Tr. at 77:15-78:10.*

Detective Gregory testified on direct examination that Ms. Wheeler told him that she had seen a newspaper article with a photograph of the robber prior to the time she was presented with the photographic lineup by the officers. *Tr. at 76:21-77:10; 85:9-93:11.* Ms. Wheeler was a teller at the Canyon National Bank in Colorado Springs on July 3, 2006, the date of the robbery. *Id. at 79:13-80:25.* Ms. Wheeler was shown a photographic lineup by CSPD officers on July 12, 2006. *Id. at 83:13-85:8; Ex. 13.* She

told the officers that sometime before July 12, 2006, a customer had slid a newspaper clipping containing a photograph of the suspect taken at the time of the robbery across her counter, and that she had turned it upside down and took it to her manager. *Tr. at 85:9-19.* Ms. Wheeler testified that she never "studied" the photograph—which was a surveillance picture—because the officers had instructed her not to follow the media about the robbery. *Id. at 85:20-88:3.* She further testified that she looked at the picture for less than five seconds, but long enough to conclude that the man in the picture seemed to be the same person that robbed the bank on July 3, 2006. *Id. at 86:23-88:3; Ex. 14.*

Similarly, Pamela Johnson testified that she thought that she may have looked at a photograph of the robbery suspect in the *Gazette Telegraph* after the lineup. She further testified that she would not disagree if Detective Gregory's notes indicated that she told him that she had seen the suspect's picture before she looked at the lineup. *Tr. at 159:1-161:7.*

Turning to my analysis, courts examine a number of factors to determine whether a photo array is impermissibly suggestive. These include the size of the array, the manner of its presentation by the officers, and the details of the photographs. *Sanchez*, 24 F.3d at 1262-63. The lower the number of photographs, the more the Court should scrutinize the lineup for indicia of suggestivity. *Id.* at 1263 (holding that a photo array with only six photographs is "a number sufficiently small to weigh heavily in the balance of factors to be considered").

The Tenth Circuit explained in *Sanchez* that the number of photographs in an array is not itself a substantive factor, but instead is a factor that merely affects the *weight* given to other alleged problems or irregularities in an array.  *Id.* at 1263.  "The larger the number of pictures used in an array, the less likely it is that a minor difference, such as background color or texture, will have a prejudicial effect on selection."  *Id.* "Conversely, when a relatively low number of photographs are used in an array, minor differences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eyes to that picture."  *Id.*  "Common sense dictates that slight irregularities are more likely to 'jump out' at a witness reviewing a single sheet of paper with only six photographs on it than at a witness reviewing a large mug book containing hundreds of photographs."  *Id.*

Having carefully analyzed the photo lineup in this case, I find that it is unnecessarily suggestive.  First, the officers used a photo array containing only six pictures.  Three of the photos had strikingly different backgrounds than the other photos.  Since a relatively low number of pictures are used, it is more likely that minor differences such as background color would have had a prejudicial effect on selection because these minor differences tend to make a particular picture stand out.  Common sense dictates that slight irregularities are more likely to jump out at a witness reviewing a single sheet of paper as opposed to a large mug book containing hundreds of photographs.

I also find that while a photo lineup is not necessarily suggestive just because the individuals in the lineup differ in facial characteristics, in this case the facial

characteristics of the majority of the persons in the lineup did not match up with the victims' description of the suspect.  A striking feature of Defendant's face is that he has a full, heavy, rounded face.  *See Position 3, Ex. 1A.*  Other than the photo of the Defendant, there is only one other individual in the lineup—in Position 4—who has a full heavy, rounded face.  Further, only Defendant and the person in Position 4 are heavy set.  These are features of the robber that each witness testified to.

Further, the only other photograph that matches the description of the robber that each witness testified to, the photograph in Position 4,  is not similar to Defendant's photograph in Position 3.  This is because the individual in Position 4 has a different hair style, expression, and location of facial hair than the Defendant.  Comparing the only two individuals with heavy, round, jowly faces, I find that the photographs in Positions 3 and 4 are dissimilar, and consequently, a witness would focus on the Defendant's photograph in Position 3.

Fourth, I am also concerned by what I perceive as procedural irregularities concerning the timing of when Defendant's photograph was released to newspapers.  As set forth above, Ms. Wheeler testified that she saw a photograph of  the person who she believed to be the robber on July 3, 2006, prior to the time that the officers presented her with the lineup.  *Tr. at 86:23-88:3.*  This was a photograph of Defendant.  Similarly, Pamela Johnson testified that she may have looked at a photograph of the robbery suspect in the *Gazette Telegraph* before the lineup (which photograph was of Defendant), and/or would not disagree if Detective Gregory's notes indicated that she told him that she had seen the suspect's picture before she looked at the lineup.  *Id. at*

*159-162.* The fairness of the presentation of the lineup by the officers is called in question when the police authorized the release of Defendant's photo to the media prior to the lineups, knowing that potential witnesses may see or even did see the photo before the lineup.

In conclusion, I find that the photo lineups were unnecessarily suggestive. This is based on the number of photographs; the limited number of photographs depicting heavy, round, jowly faces; the differences in hair, facial hair and expressions in the only two photographs that do depict such heavy, round, jowly faces; the differences in background in the lineup; in conjunction with the release of the suspect's photograph to the media after an arrest warrant was issued but prior to the witnesses' identifications.

B.    The Second Step - Were the Witnesses' Identifications Reliable?

Because I have concluded that the photo array was unduly suggestive, I must now decide whether the identification was reliable under the totality of circumstances. *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *United States v. Thurston*, 771 F.2d 449, 453 (10th Cir. 1985). Each witness's identification is examined in light of the factors articulated in *Neil* to evaluate the reliability of the identification. Consistent with the manner in which the Government presented its evidence, the Court first evaluates the identification made by the eyewitnesses to the Colorado Springs' robberies.

1.    The Colorado Springs Robberies

a.    Detective Gregory

Detective Gregory presented the photo lineup to five witnesses—Emily Alfrey, Deanna Wheeler, Pamela Johnson, Lorraine Throne and Jamie Stitsinger. *Tr. at*

*11:19-12:19.*  Detective Gregory advises witnesses not to look at surveillance tapes after a robbery.  *Id. at 58:19-23.*  His practice is to read to the witness an admonition contained on an admonition form before presenting the photo lineup.  *Id. at 13:12-14:18; Ex. 2.*  He typically asked the witness whether somebody in the lineup immediately draws their attention.  *Tr. at 65:5-24.*

Emily Alfrey

Detective Gregory followed this procedure with Ms. Alfrey on July 12, 2006.  *Tr. at 12:15-24; Ex. 2.*  Ms. Alfrey's bank was robbed on July 3, 2006.  *Tr. at 14:20-15:1.* The detective did not coach Ms. Alfrey or make any suggestions during the identification process as to which photograph to pick.  *Id. at 15:2-15:17.*  Ms. Alfrey identified the Defendant within a period of ten to 15 seconds, said she was 100% certain in response to a question from Detective Gregory, and circled, signed and dated her identification on the lineup.  *Id. at 15:19-16:11; 17:9-22; Ex. 25.*

Ms. Alfrey also advised the detective that she briefly observed the suspect after Deanna Wheeler removed money from the teller drawer and handed it to the suspect in response to a demand.  *Tr. at 20:6-21:13.*  Detective Gregory testified that the bank was relatively small, maybe thirty feet square.  *Id. at 21:17-22; Ex. 14 (depicting the suspect entering the bank).*  Ms. Alfrey told the detective that she had not seen any photographs of the suspect in media coverage.  *Tr. at 23:1-7.*

Deanna Wheeler

Ms. Wheeler testified that she was robbed on July 3, 2006 at approximately 3:00 or 3:30 p.m.  *Tr. at 79:22-80:5.*  She picked the suspect from the lineup on July 12,

2006. *Id at 84:1-5.* She described the man who robbed her as white, heavyset, between 230 and 250 pounds, grayish, salt and pepper hair, beard and moustache, and between 53 to 55 years old. *Id. at 80:14-25; 93:25-94:5.* She was two to three feet away from the suspect when she was robbed, the bank was well lit, she had no vision problems, she was looking directly at the suspect and was focused on him, and her view of the suspect was unobstructed. *Id. at 81:8-82:7.* Ms. Wheeler testified that she observed the Defendant for three to four minutes on the day of the robbery. *Id. at 109:20-110:16.*

Detective Gregory followed the same process with Deanna Wheeler—he read to her from the admonition form and after that presented the lineup. *Tr. at 23:22-24:15.* He asked Ms. Wheeler if someone in the lineup immediately drew her attention. *Id.* Ms. Wheeler picked Defendant and stated that he "jumps out" at her, that none of the suspects were even close, and that she was eighty percent certain that he was the man who robbed her. *Id. at 24:11-25:13; 84:21-85:8.* She circled and dated a copy of the photo lineup. *Id. at 24:11-25:13; 83:13-84:5; Exs. 13, 25 and 26.*

Detective Gregory did not coach Ms. Wheeler during the identification process as to which photograph to pick. *Tr. at 29:8-19; 84:6-20.* She testified that Detective Gregory told her he was going to show her a group of pictures, to take her time to look at it, and if she saw anyone she recognized, to tell him. *Id. at 84:6-10.* She also testified that he did not suggest anything, make any gesture, smile, or comment on anything or on her choice. *Id. at 84:11-20.* Since the robberies in question, Defendant has grown a long, white, flowing beard. Despite this, Ms. Wheeler also identified the

Defendant in the Courtroom, and testified that she recognized him because of his eyes, his build, and the shape of his face. *Id. at 93:12-20; 105:18-106:4; 107:23-108:4.*

<u>Jennifer Stitsinger</u>

Ms. Stitsinger, who previously was employed as a teller at Key Bank at the intersection of Woodman and Hartsel Drive in Colorado Springs, was robbed on June 29, 2006. *Tr. at 243:9-244:7.* She described the robber as white, tall, overweight, middle aged to older approximately late 50s to late 60s, dark eyes, tan skin, and white hair with gray undertones. *Id. at 244:8-24.* He had on a goldish yellow T-shirt with black block lettering, dark jeans, white high-top tennis shoes, and a black cap. *Id. at 244:11-13.* Ms. Stitsinger also testified that the robber was two feet away from her, the bank was well lit, she had a clear view of the robber and her view was unobstructed, and she observed his face but did not focus on it as she did not want to stare. *Id. at 245:1-246:19; Ex. 12.* As to the robber's face, she noticed his skin was tanned and leathery looking, and his eyes were dark with dark eyebrows. *Tr. at 246:15-19.* She observed him in the bank for two to three minutes. *Id. at 254:10-19.* She identified the Defendant in the Courtroom as the man who robbed her. *Id. at 246:20-247:5.*

Detective Gregory read the admonition and presented the photo lineup to Ms. Stitsinger on July 17, 2006. *Tr. at 30:23-32:15; 247:7-248:24; Exs. 1A, 2, 11.* Ms. Stitsinger also identified the Defendant, indicating at first that she was eighty to ninety percent sure that he was the suspect, and signed, dated, and circled her choice. *Tr. at 31:1-32:15; 246:2-7; Ex. 11.* She then stated, after she had continued to view the photo lineup, that she had become ninety to one hundred percent (or close to 100

percent) sure of her choice. *Tr. at 33:10-15; 249:13-22.* Ms. Stitsinger was struck by

the Defendant's eyes in the photo lineup, and wrote on the lineup "90% -100% - sure

eyes are it." *Id. at 249:17-250:3; Ex. 11.*

Detective Gregory did not coach Ms. Stitsinger about which photograph to pick,

nor hint or suggest about any one of the possible candidates. *Tr. at 249:1-11.*

Ms. Stitsinger had not seen any media reports or pictures of the robbery suspect

before identifying the Defendant. *Id. at 251:6-12.*

Pamela Johnson

Ms. Johnson, a teller at Key Bank on North Academy Boulevard in Colorado

Springs, was robbed on June 6, 2006. *Tr. at 129:22-130:18.* She testified that the

robber approached her at the teller line and demanded money. *Id. at 130:17-18.* The

robber was tall, older, gray, and heavyset with a stocky build. *Id. at 130:19-22.*

Ms. Johnson testified that the robber was less than two feet away standing directly in

front of her, the bank was well lit, her view was unobstructed, the robber was

unmasked, she looked at his face, and observed him for a minute to a minute and a

half. *Id. at 131:8-133:5.* She also stated that she had received training from her

employer in procedures to follow in the event of a robbery, and that she was trying to

collect information for a description of the robber during the time that the robbery took

place. *Id. at 148:19-150:4.*

Detective Gregory used the same process with Pamela Johnson on July 17,

2006 when he presented the photo lineup. *Tr. at 133:22-134:4.* Detective Gregory

asked her if any of the persons in the lineup looked like the robber. *Id. at 134:1-4.* He

did not coach Ms. Johnson about which photograph to pick, nor hint or suggest about any one of the possible candidates. *Id. at 37:3-13; 134:1-14.* In response to viewing the admonition and related lineup, Ms. Johnson pointed to the Defendant's photograph and said "absolutely, it's him" and that she was 98.9% sure. *Id. at 35:15-19; 136:18-20 Ex. 8.* Ms. Johnson testified that she was "very certain" of her selection. *Tr. at 136:16-20.* She testified that she recalled the Defendant because of his facial features, his older puffy face, his beard, his gray hair and eyes. *Id. at 161:20-162:1.* She signed a form with her selection. *Ex. 8; Tr. at 35:20-36:13; 135:21:25.*

In the Courtroom, Ms. Johnson identified Defendant as the robber. *Tr. at 130:23-131:6.* She testified that this identification was based on his gray hair, his age, and his heavy set build. *Id. at 162:6-11.*

Ms. Johnson testified that she saw no newspaper articles containing any photographs of Defendant between June 6 and July 17, 2006, and had not seen a photograph of the robber from the bank prior to the lineup. *Tr. at 141:1-6; 137:3-24.* In response to questioning about Detective Gregory's report which indicated that she had seen a picture of the robbery suspect in the newspaper before the lineup, however, Ms. Johnson testified that while she thought it was after, she could not remember. *Id. at 159:11-18.* Further, she said that if that statement was in the detective's report, she was sure she said that. *Id. at 161:2.*

<u>Lorraine Throne</u>

Detective Gregory also showed the same lineup to Ms. Lorraine Throne, who was present at the same robbery as Ms. Johnson, on July 17, 2006. *Tr. at 37:15-25;*

-12-

*39:12-22.* Ms. Throne was unable to identify the Defendant as the man who robbed

her. She also chose not to make any identification, but stated that the person in the

number six position (lower right) looked closest to the suspect. *Id. at 37:15-38:11.*

　　　　　　　　　b.　　Detective Beck

　　　　Detective Mark Beck, also a CSPD officer, presented the same photo lineup on

July 21, 2006, to three victims who had been involved in the robbery at World Savings

Bank in Colorado Springs—Yvonne Harris, Maria Carmen Luna and Sharon Hanson.

*Tr. at 170:3-171:6; Ex. 1A.* Detective Beck showed the photo lineups to each witness

separately, asked each witness individually to recount how the incident occurred, and

read directly off the admonition form to each witness before presenting the lineup. *Ex.*

*2; Tr. at 171:8-172:17.* Detective Beck testified that each of the three witnesses

provided him with similar information about the robberies as was noted in his case

reports. *Tr. at 195:2-196:17.*

　　　　Schellon Yvonne Harris

　　　　Ms. Harris was a supervisor in the World Savings Bank when it was robbed on

May 10, 2006. *Tr. at* 200:4-17. Ms. Harris described the robber as white, gray haired

with a pony tail, thick beard and mustache, heavy build, 6 feet tall, and 55 to 60 years

old. *Id. at 200:18-201:5.* At the time of the robbery, she was only a couple of feet away

from the robber. *Id. at 202:6-13.* The bank was well lit, her view was unobstructed, the

robber was unmasked, and she "looked him right in the face." *Id. at 202:14-203:5.*

　　　　On July 21, 2006, Detective Beck presented her with a photo lineup. *Ex. 5.*

Ms. Harris identified the Defendant as the man who robbed her, and signed, dated and

initialed her selection. *Tr. at 172:18-173:2; 173:16-174:9; Ex. 5.* Ms. Harris stated that

she looked at each picture carefully before picking out the Defendant. *Tr. at 211:20-*

*212:25.* She testified that she advised Detective Beck that she was "very certain" of

her choice. *Id. at 205:13-18.*

Detective Beck did not coach Ms. Harris during the identification process as to

which photograph to pick, and gave her no feedback about the choice that she made.

*Tr. at 173:3-12; 205:1-12.* He read her an admonition before he showed Ms. Harris the

lineup. *Id. at 171:10-172:17.* Ms. Harris told the detective that she had not seen any

media reports before identifying the Defendant. *Id. at 174:14-19.* She also had seen

no pictures of any suspects in the media before the time that she selected Defendant in

the photo lineup and that she does not read the Colorado Springs newspaper. *Id . at*

*205:20-23; 211:15-18.*

Sharon Hanson

Ms. Hanson testified that she was at the Word Savings Bank on May 10, 2006,

when an armed man demanded her "large bills." *Tr. at 216:3-11; 175:1-7.* She

described the robber as white, older with "longish" "grayish" white hair, and a

mustache. *Id. at 216:12-18.* At the time of the robbery, she was only two feet away

from the robber, the bank was well lit, her view was unobstructed, and she was focused

on him. *Id. at 216:20-217:6.*

On July 21, 2006, Detective Beck presented Sharon Hanson with a photo lineup,

after reading her the admonition. *Ex. 6;  Tr. at 175:8-176:7.* Ms. Hanson identified the

Defendant as the man who robbed the bank, and signed, dated and initialed her

selection. *Id.* She testified that she picked him immediately from the photo lineup. *Tr. at 220:20-24.* She also testified that she had no hesitation when she identified the Defendant in the photo lineup. *Id. at 224:2-10.* Her identification was based on the shape of the suspect's head and the "down of his mouth". *Id.* Ms. Hanson stated to the detective that she was 85% to 90% sure that the photograph that she had selected was of the man who committed the robbery, and indicated that the photograph looked just like him. *Id. at 177:3-16.*

Detective Beck did not coach Ms. Hanson during the identification process as to which photograph to pick, influence her in any way or give her feedback on her choice. *Tr. at 176:14-177:2; 218:10-220:3.* Ms. Hanson denied to the detective that she had seen any media pictures or reports before identifying the Defendant in the photo lineup. *Id. at 179:14-23.* She also had not seen any pictures of any robbery suspect before being presented with the photo lineup. *Id. at 220:15-17.* She did see on television a little blurb saying that the police had arrested someone. *Id. at 223:10-14.*

Ms. Hanson identified Defendant in the Courtroom as the man who robbed her. *Id. at 217:7-14.* On cross examination, she stated that she was able to identify the Defendant in the Courtroom because she recalled the shape and coloring of his face and his hair coloring. *Id. at 222:4-9.*

<u>Maria del Carmen Luna</u>

Ms. Luna, a customer-service specialist for World Savings Bank, also witnessed the May 10, 2006, robbery. *Tr. at 227:1-16.* Ms. Luna testified that an older, tall, white haired, heavy set white male robbed the bank. *Id. at 228:6-21.* He was wearing a

black jacket and "ski-type sunglasses." *Id.* At the time of the robbery, she was only a "couple of feet" away from the robber, the bank was well lit, her view was unobstructed, she was focused on him, and she had a chance to observe him for a "couple of minutes." *Id. at 228:17-230:4.* She identified the Defendant in the Courtroom as the man who robbed her, and stated that it was the shape of his face that enabled her to identify him. *Id. at 230:5-15; 237:12-238:3.*

On July 21, 2006, Detective Beck also presented Ms. Luna with the photo lineup, after reading her the admonition. *Ex. 7; Tr. at 177:18-24; 230:17-231:21.* Ms. Luna identified the Defendant as the man who robbed the bank, and signed, dated and initialed her selection. *Tr. at 178:2-24; 230:17-231:21; Ex. 7.* Detective Beck did not coach Ms. Luna during the identification process as to which photograph to pick, and gave her no feedback. *Tr. at 179:2-13; 231:22-232:14.* Ms. Luna was "pretty certain" that she had picked the right individual in the lineup. *Id. at 232:16-18.* Ms. Luna also denied having seen any media reports or pictures showing any suspects before identifying the Defendant in the photo lineup. *Id. at 179:14-23; 232:24-233:2.*

### 2.     The Metro Denver Area Robberies

Investigator Ralph Gallegos is employed by the Jefferson County Sheriff's Office and is assigned to the RMSSTF. *Tr. at 258:3-12.* Investigator Gallegos has been a detective for 12 years, is trained in the presentation of photo-lineups, and estimated that he had presented a couple of hundred photo lineups. *Id. at 258:16-21.* In mid-July, 2006, he received a photo lineup including the Defendant's photograph from Detective Anderson of the CSPD, made copies of this lineup, obtained some blank

photographic lineup admonition forms, and contacted the victims of the robberies that were part of the investigation. *Tr. at 258:22-259:10; Ex. 3.* Investigator Gallegos had no concerns about the fairness of the lineup. *Tr. at 260:1-3.*

Investigator Gallegos testified that his typical procedure in photo lineups is to meet with the putative witness privately, advise the witness that he is going to present them with a lineup, hand the witness the admonition form and ask him or her to read it, and ask the witness if they have any questions about it. *Tr. at 260:6-261:4.* Investigator Gallegos then explains the admonition form, indicating that the suspect may or may not be in the photo lineup, that it is just as important to keep innocent people out of jail as it is to identify the perpetrator, and that it is up to the witness to determine whether the person who committed the crime is in that lineup. *Id.* He asks the witness to review and sign the admonition. *Id. at 261:5–25.* He follows this procedure with every single witness. *Id. at 273:1-274:7.* His practice is not to show the witness any pictures of the suspect before presenting the lineup. *Id. at 264:15-20.*

Investigator Gallegos presented the lineup to three witnesses: Victoria Aragon, Jennifer Baca and Christine Diaz. *Tr. at 258:22-259:10; 261:5-271:12.* He testified that he did not influence these witnesses' selection process. *Id. at 272:15-25.*

Victoria Aragon

Ms. Aragon was the branch manager of the World Savings Bank Branch on Belleview Avenue in Littleton on May 1, 2006, when the Bank was robbed. *Tr. at 279:15-24.* She was ten feet away from the robber and her attention was focused on the suspect after the victim teller snapped her fingers at her and mouthed that she had

been robbed.  *Id. at 279:25-280:11.*  Ms. Aragon was 10 feet away from the suspect, viewed his face and paid attention to him, and was trying to observe details about him. *Id. at 280:4-15; 282:11-283:17; Exs. 20, 21.*  She described the suspect as white, tall - approximately 6 feet, longer white or gray hair, scruffy, unshaven, and heavyset with a beer belly.  *Tr. at 280:16-281:7.*  At the time, the bank was well lit, her view was unobstructed, and she had a chance to observe the suspect for a "couple minutes" during which time she was trying to observe details about him.  *Id. at 281:14-282:10.*

Investigator Gallegos presented the admonition and photo lineup to Victoria Aragon on July 25, 2006.  *Tr. at 261:5–262:4; Exs. 22, 23.*  Investigator Gallegos testified that he met with Ms. Aragon in a private area of the bank and she appeared to understand the admonition that he provided her with.  *Tr. at 261:7–263:1.*  Investigator Gallegos advised Ms. Aragon, consistent with the language of the admonition, that merely because photos were being presented, it should not lead her to believe that the guilty person has been caught and that she did not have to identify anyone in the lineup.  *Id. at 263:2-10.*

Investigator Gallegos gave Ms. Aragon some time to consider the photos in the lineup, after which Ms. Aragon picked the Defendant as the man who robbed her and signed and dated her selection.  *Tr. at 263:9-264:6; Ex. 23.*  Investigator Gallegos did not provide to Ms. Aragon any hints, affirmation or  encouragement during the identification process as to which photograph to pick, and gave no information as to whether she had picked the right suspect.  *Tr. at 264:7-265:24.*

Ms. Aragon confirmed that Investigator Gallegos provided her with instructions before presenting the photo lineup, and testified that she did not feel compelled to pick anyone nor was any attempt made to influence the selection procedure. *Tr. at 284:9-286:1*. She also testified that she did not know whether the lineup even contained a photo of the suspect. *Id. at 293:3-25*. She testified that she was "pretty certain" of her selection. *Id. at 286:1-19; Ex. 23*. Ms. Aragon also identified the Defendant in the Courtroom as the man who robbed her. *Tr. at 283:24-284:7*.

Jennifer Baca

Jennifer Baca, an assistant manager at World Bank in Littleton, was a witness to the robbery on May 1, 2006. *Tr. at 301:20-302:7*. She testified that she was ten feet from the robber and observed him because he did not look like an existing customer, and she recognizes most of the bank's customers. *Id. at 302:11-304:8; 322:16-23*. Ms. Baca greeted the robber as he entered the bank. *Id. at 317:3-15*. She described him as gray haired and big, with a big belly, and blue eyes. *Id. at 302:17-303:24*. He was wearing jeans and a hat. *Id. at 302:22-23*. She continued to observe him after she learned that the bank had been robbed, and even moved to a side window of the bank and continued to watch him after he left the building for 30 seconds. *Id. at 304:9-305:9; 305:18-20*. At this time the robber was only three or four car lengths away. *Id. at 321:7-322:8*.

Ms. Baca testified that she was trained to observe details about robbery suspects so that she could report details to law enforcement, and made an effort to keep her eyes on the robber once she realized that the bank had been robbed. *Tr. at*

-19-

*305:4-9; 305:25-306:2.*   It was broad daylight when the robbery occurred and there

were no obstructions to her observation of the robber.  *Id. at 304:10-17.*

Investigator Gallegos also presented the admonition and photo lineup to

Ms. Baca on July 25, 2006, at the World Savings Bank.  *Tr. at 267:2-267:18; Ex. 18.*

He followed the same admonition procedure that he described above, and Ms. Baca

appeared to understand the instructions.  *Tr. at 268:1-10.*  She signed and dated the

admonition form.  *Tr. at 308:6-8; Ex. 18.*  When presented with the lineup, Ms. Baca

selected photograph number 3 (of the Defendant), and indicated she was 85% sure

that it was the person who robbed her.  *Tr. at 268:1-22; Exs. 18 and 19.*  She wrote the

word "possible" next to photograph number 3, testifying that she was not 100% of her

pick because there was another individual in the lineup, in the number 4 position, who

seemed similar to her.  *Tr. at 323:3-324:9; Ex. 19.*

Investigator Gallegos did not provide any hints or encouragement to Ms. Baca

during the identification process as to which photograph to pick.  *Tr. at 269:25-270:16;*

*308:9-309:4.*  Ms. Baca had not looked at any news media containing pictures of the

suspect, and nor did Investigator Gallegos attempt to refresh her memory by showing

her any pictures of surveillance tapes.  *Id. at 309:18-310:6.*  Ms. Baca testified that it

was the Defendant's eyes, cheeks, and beard that led her to pick him in the lineup.  *Id.*

*at 310:7-21.*  She identified him in the Courtroom as well.  *Id. at 310:22-311-20.*

Christina Diaz

Investigator Gallegos also presented the admonition and photo lineup to

Christina Diaz on July 25, 2006.  *Tr. at 269:5-271:12; Ex. 15.*  Again, he followed the

same admonition procedure described above, and Ms. Diaz appeared to understand

the instructions and was paying attention to the admonition and its related process. *Id.*

When presented with the lineup, Officer Gallegos testified that Ms. Diaz identified

Defendant in the number 3 position and wrote that she was 99% sure that he was the

person that robbed her. *Tr. at 269:5-24; Ex. 16.* Consistent with his practice,

Investigator Gallegos did not provide any hints or encouragement to Ms. Diaz during

the identification process as to which photograph to pick. *Tr. at 269:25-270:16.*

       3.   Analysis

The reliability of the witness's identification must be evaluated in light of the

totality of the circumstances in order to determine whether the suggestive array created

a substantial likelihood of irreparable misidentification. *Grubbs v. Hannigan*, 982 F.2d

1483, 1489-90 (10th Cir. 1993). When evaluating the reliability of an identification, the

court must examine five factors: (1) the opportunity a witness had to view the criminal at

the time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior

description of the criminal; (4) the level of certainty demonstrated by the witness at the

confrontation; and (5) the length of time between the crime and the confrontation. *Neil*

*v. Biggers*, 409 U.S. 188, 199 (1972). I find that the application of these five factors

supports the reliability of the identifications made in this case.

First, Defendant did not wear a mask or cover himself in any way during his

robberies, other than possibly wearing sunglasses. The victim tellers and employee

witnesses had a clear view of his ethnicity, hair color, facial hair, height and build. The

witnesses also had sufficient time to observe Defendant. Further, the banks were well

lit, and the witnesses' views of Defendant were unobstructed and at a relatively close distance. All of these factors are sufficient for a reliable identification. *See, e.g., United States v. Bredy*, 208 F.3d 1193, 1198 (10th Cir. 2000) (although robber wore mask, tellers could reliably determine his build and attire); *United States v. Rundell*, 858 F.2d 425, 427 (8th Cir. 1988) (brief view of robber wearing cap and sunglasses did not prevent witness from having sufficient impression to make reliable identification); *United States v. Jarrad*, 754 F.2d 1451, 1455 (9th Cir. 1985) (3-4 second view of robber at 45 feet sufficient to permit clear view of face and build).

Second, the witnesses testified that they were paying attention to the robber, some of them both before and after they became aware of a robbery in progress. Many witnesses testified that they were attempting to observe details about the robber to later report to law enforcement. The witnesses were able to provide physical descriptions of the robber, as were able as well to provide specific characteristics of the Defendant which enabled them to pick him out of the photo lineup.

Third, each of the victim-tellers and witnesses provided a detailed description of the robber which closely matched the Defendant's physical appearance. Based on the number of details that these witnesses were able to recall, it appears that they paid relatively close attention to the Defendant during the crime. *See Bredy*, 209 F.3d at 1196 (identification reliable because witnesses' testimony recalling several descriptive details indicated their attention was focused on robber).[1]

---

[1]  I note that some of the descriptions of the robber by the witnesses, such as eye color, tattoos, sunglasses and/or the robber's clothing, were off and/or did not necessarily match what was shown on the surveillance camera or what was written in the reports. However, I find that these were relatively

Fourth, each witness who identified the Defendant from the photo lineup did so with a high level of certainty at the time of the lineup.  They did so after carefully evaluating the other potential candidates, and ruling those candidates out, and did so with no suggestion, prompting or feedback on the part of law enforcement.  The Court also notes that the admonition provided by the officers was appropriate and was not tantamount to the officers improperly interfering with the selection process.

Fifth, the short interval of time between the crime and the identification further adds to the reliability of the identification.  *Cf. United States v. Shoels*, 685 F.2d 379, 385 (10th Cir. 1982) (two month interval was not a substantial amount of time which would impede identification); *United States v. Jacobowitz*, 877 F.2d 162, 168 (2d Cir. 1989) (ten month interval between crime and confrontation not enough, in light of other factors, to preclude in-court identification); *Lavernia v. Lynaugh*, 845 F.2d 493, 500 (5th Cir. 1988) (identification over a year after crime was reliable); *United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987) (three to four months); *United States v. Wilson*, 787 F.2d 375, 386 (8th Cir. 1986) (four months); *United States v. Burke*, 738 F.2d 1225, 1229 (11th Cir. 1984) (two months).  In this case, almost all of the lineups were conducted by law enforcement within two and a half to three months of the robbery.  The only exception to this was the January 10, 2006 World Savings Bank robbery involving Christine Diaz, in which Ms. Diaz picked the Defendant on July 29, 2006 -

---

minor inconsistencies and do not diminish in any significant way the overall reliability of the witnesses' identifications.

almost seven months later.[2]  Furthermore, when shown the photo array, the various witnesses almost immediately identified Defendant as the robber.

The identification procedures in this case did not create a "very substantial likelihood of . . . misidentification."  *Neil*, 409 U.S. at 198.  Because the totality of the circumstances indicates that the eyewitnesses' identification of the Defendant were reliable, the admission of such identification evidence will not deprive the Defendant of his due process rights.

IV.    CONCLUSION

Wherefore, based on the foregoing facts and law, the Defendant's Motion to Suppress Identification (Docket No. 12) is **DENIED**.

Dated:  July 25, 2007

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge

---

[2]  However, Ms. Diaz wrote on the lineup that she was 99% sure of her identification of Defendant..